All right, we will move next to United States v. Otuonye, number 19-3250. Mr. Kimmerer, you may proceed. Thank you, Your Honor. Members of the Court, my client, Mr. Otuonye, owned a small pharmacy in Wichita, Kansas. It was in fact called Neighborhood Pharmacy. And in October of 2014, Dr. Hansen, who was unknown to Mr. Otuonye, started having some of his clients go there to get the prescriptions filled. The prescriptions were being filled for Class II drugs. Because of the amount of the prescriptions and everything, it was only happened that both Dr. Hansen and Mr. Otuonye were charged with conspiracy to dispense illegal drugs because they served no medical purpose. They were illegitimate. Mr. Hansen went to trial and was convicted along with some of his patients. And Mr. Otuonye's argument on behalf of Mr. Otuonye is that they had a James hearing at that trial to determine some of the statements that were to come in from co-conspirators and was there conspiracy. And the Court, after listening to the evidence, and most of the evidence was really what happened with Mr. Hansen's case and what he was doing. It was pretty clear from all of the evidence, and I think conceded by both the government and the Court, that Mr. Otuonye really didn't know anything about the business practices of Dr. Hansen. He really knew nothing about the end product of the drugs after they were dispensed. But the Court still found there was a conspiracy between Hansen and Otuonye. And to do that, he had to show that there was independent evidence that Mr. Otuonye was connected to the conspiracy. What about that? Let's talk about that evidence. As I understand it, there was evidence that Hansen was writing prescriptions far beyond what any legitimate medicine a patient would need to use. And presumably, they inferred that, could infer that the defendant was aware of that. He should have known that scripts, this number of scripts, were outside the normal course of practice and that they would lack legitimate medical purpose. These are independent, these are findings. I guess that's not independent evidence, but that's the findings the judge made based on the evidence, right? Well, the judge made three findings. Number one was what was a three-to-one policy that Dr. Otuonye had at his pharmacy. They tried to link in the fact that the three-to-one policy was really created as part of the conspiracy. What about that? That was the primary example of I struggled to understand your dispute on your first issue there with that. Why doesn't that show independent evidence? Well, it was a policy that was not created by the conspiracy. It was a policy that Otuonye had, in fact, in effect, almost two years before that. And there was evidence to that from a couple of his employees. I believe there were some documents that showed that. So the three-to-one policy was not part of the conspiracy, but it was a policy that- Was there evidence that he was widely using his three-to-one policy for October of 2014? He was using it in 2014? He was using it- Not just that he was using it, but that he was using it on the same scale that he did in 2014. Well, he wouldn't have used it on the same scale because there was a huge increase in the number of prescriptions that were going through his pharmacy because- And what about that? That's another piece of independent evidence. That is another piece of information. Pretty good size. And that came from Dr. Henson. He was providing a lot of prescriptions. As a matter of fact, when it started before 2014, a couple of patients from Dr. Henson went to him to fill prescriptions. They weren't out of line. But then early in October, there was an influx of patients from Dr. Henson going to Mr. Otunio. And those particular patients, the prescription numbers were high. As a matter of fact, Mr. Otunio was concerned about it. He called Dr. Henson and at first refused to give him the prescriptions. And Dr. Henson said it was not a problem, but- Why is it relevant? Why is that relevant? You talk about that a few times in your brief. Why is it relevant that at the beginning of this whole- Because I think it helps show that Mr. Otunio was not part of a conspiracy. But then he eventually does. He leaves a voicemail for Henson saying that he needed the non-narcotic prescriptions to be on the three to one ratio. Yes. He clearly understands what's going on at some point here. And whether he may at first have he's in. I guess I don't understand the- And that's one of the third pieces of evidence the judge found was the telephone call on October 25th. And the explanation of that call was, yes, he did call Henson because it was a patient of Henson's. And he wanted to tell him that that person ordered to get the prescription that was brought in needs this three to one ratio that he required. But what would be the rationale for needing the three to one ratio unless you're trying to change your numbers, change your- In one of the statements to the agent, Mr. Otunio said that the reason that was because he wanted to make sure that the patients coming to him were just buying class two drugs, that he wanted them to be subscribed with a full array of prescriptions. There was an issue with, he had had some years before in terms of his supplier, where they can, well, how many scheduled two medications you can get basically on a percentage basis. And by doing that, he didn't go over the percentage. So it was a way of adjusting his inventory and following him from that standpoint. That was his rationale for the three to one ratio. Is this common in the pharmaceutical industry to have a three to one ratio? Yes. It is? Sorry, continue. So it's our position on that point on the James issue that there was a finding there the judge made that the patients were not co-conspirators, that the patients were not there. And that basically that Mr. Otunio did not know about the doctor's business practices, nor did he know about the end use of the drugs by the patients. But which gets into the second issue is because it's a trial transgressed. The government kept trying to bring in all of these patients to testify and kept trying to argue with the court that they were co-conspirators. The judge did not buy that argument, but accepted an argument from the government that they could tell, complete the story, the race gesti of what the facts were. So the end result is that all of these patients who really weren't conspirators and couldn't testify to hearsay ended up testifying anyway. And I think there was only seven witnesses called, but there was 20 witnesses that actually were referred to in terms of their conduct and everything. And all of that information was allowed in. Counsel, is this your confrontation clause argument? Yeah, this gets into the confrontation clause argument. Yes. And there's an issue as to whether you preserved that question. Is that what we need to address? Well, that is probably something that needs to be addressed. I know the government certainly raised the brief that the confrontation clause really was not preserved on appeal. The trial counsel did object. Was it preserved? Your Honor, it was certainly referenced in the sense that he objected to the fact that he couldn't cross-examine these witnesses. They would be unavailable. Wouldn't that go to an objection, a general hearsay objection, just as much as it might go to a confrontation? He did specifically reference cross-examination, Your Honor. But he couldn't cross-examine. That's my question. Don't hearsay objections sometimes take the form. It's hearsay. We don't have an opportunity to cross-examine. Yes, I agree. And I agree that the objections could have been a little bit more artful. And along those lines, counsel, that goes also preservation to issues five and six that you raised. Isn't that correct? Whether or not you've waived those? Yes, there are questions about that. That's correct. Are you, let me clarify on issue two. Are you referring to, uh, you say there was an objection to not cross-examining, being able to cross-examine those, those witnesses. Are you referring to where he said he did make a hearsay objection? He said it's hearsay and it's going to be on a cold record. Is that what you're referring to? That's what you're interpreting. That's where that statement was being made. That's what you're interpreting as an objection to not cross-examining or not examining. Okay. All right. Counsel, could I just, uh, uh, ask you, you, you, you, you respond to judge Baldock about issues five and six. Uh, I had a specific question about, uh, issue six, which, which has to do with the sentencing and, uh, the drug quantities. Um, and my question is, uh, is it your position or do you agree that the district court failed to rule on your objection at the sentencing hearing as to drug quantities? I agree in terms of breaking the quantities down, uh, a rule on the basis between what was a controlled substance and what was not a controlled substance. Well, I have to also agree, uh, that the, that the record is not clear. Uh, okay. Let me, there is no real objection along the lines that we're talking about, which we raised in our brief. Let, then let me put the follow-up question to you this way. Um, if the district court did fail to, uh, rule on your objection, um, why isn't the government correct that you didn't preserve your sentencing challenge because, uh, you need to object, uh, to that failure to rule under federal, uh, rule of criminal procedure 32. How do you respond to the government's position on that? I believe the government is right in that position, your honor. And where, so where does that leave us on, uh, issue number six? Under six, I didn't get to number six and I wasn't intending to argue number six just for the very reason I stated. Okay. Are you conceding number six at this point? I would concede number six, your honor. Thank you. The other argument that we raised is that so much of the evidence that came in was cumulative. There were objections about the number of, uh, witnesses that came coming in with the same testimony. Even the judge recognized in the record that, uh, the evidence was getting cumulative. The problem, let me ask you about that because you did, you did make an objection. Um, I think it was regarding the business practices, uh, that this was cumulative and the government sustained that objection, but I didn't see, um, an argument about an objection about it being cumulative, any other evidence being cumulative. And so I, I wonder why we aren't at plain error on that. I didn't see that you argued plain error. No, there were the, the number of witnesses that were being called kept saying the same thing. And it was really not about two unknown use practices as much as it was about their addiction, their problems, uh, their life. I'm just asking, did you object, um, to any, did you make any other cumulative objection? There were a cumulative objections, the most key, the one that you made was sustained. There were no sustained objections. There was an argument, uh, that was made in the motion for a new trial that was more specific about the cumulative objections. Okay. But at the time of the trial, uh, that was more of a general direction. And so much of it was coming in the trial council at that point, kind of just said, what's the use? And it just kept coming in. Then he would make just a general objection. Another issue we raised were the charts council where we're out of time. If you want to make one point, uh, I was just going to mention, uh, the charts charts were prejudicial, uh, to the defendant because they, they were not summary charts. They brought in new evidence and no basis for them. No foundation. They just basically are basis for the government to enhance their witnesses in the case. Thank you. Your honor. Right. Thank you. Council. Uh, Mr. Brown, good morning, your honors, James Brown for the United States. Uh, I'd like to start by talking just very briefly about the way issues. And then I'll, I'll go into issues one and two and focus primarily on those issues and touch on other issues as the court questions has questions. Um, there are, there are several wave claims because the defendant has not argued for confrontation clause claim is waived. He did not mention the confrontation clause below issue three C having to do with the business practices. Specifically. We referenced that as issue three C, um, defendant did not identify where he raised that issue. It is brief. Uh, he doesn't argue for plain error. It's application on appeal issue five, the charts, um, that is also waived under plain error review. He objected to the charts on sometimes no grounds in the district court and sometimes cumulative grounds. And then now on appeal, he presents several other different grounds and he doesn't argue for plain error. It's application on appeal. That issue is waived. I thought he objected to the charts on, he said relevance and all that relevance and all that. Um, and I thought to some degree he was arguing relevance on the charts, but well, the, uh, the, uh, charts, I think we deal with this on page 63 of our brief on exhibit 161, the chart, there was no objection exhibits 162 to 166. The objection was cumulative on exhibit 203. Another chart, there was an objection with no ground stated and only exhibit 204 was a chart, uh, he objected based on relevance. Um, he doesn't make a relevance chart, a relevance claim on appeal. He says they lack foundation. We're highly prejudicial, misleading, biased, confusing, inflammatory, and we're based on facts, not admitted into evidence. So, um, even that doesn't preserve the issue. We think that all of those, all of those claims are waived for lack of objections. We point out in our briefing under the issue raised and ruled on section exactly what, what, what objections were made and where they were ruled on. And he didn't raise any of the claims. Even in oral arguments, the defendant says that they were highly prejudicial. That's, that's not a claim that he made below as to any single chart. And then we get to the last issue that's waived. This is a sentencing issue. Defendant has conceded that's waived. So that being said, I'll move on to issue one. And that's the, uh, the court's, uh, finding that a conspiracy existed under James and Majorelle. The, uh, we'd like to remind the court, not that needs reminding, that the standard is preponderance. The court had to make the finding by preponderance. And this court will review the district court's finding made under a preponderance standard, uh, by a clear air standard. So all the court has to conclude is that the district court's view of the evidence that it looked at was a permissible or plausible view of the evidence, even if the court could have taken another view of the evidence. Then we get to the whole independent evidence issue. The, the amount of independent evidence required for, for the determination does not need to be substantial. That's what this court said in Alcorta. Uh, so that leads us to the grounds that the court cited. Mr. Brown, before we leave independent, uh, evidence, why was the voicemail, uh, from the defendant to Dr. Henson independent evidence? Why, why, why would, why does it fit that category? Well, that was, that was the defendant's, that was the defendant's own voice. It didn't involve any statements from, from Dr. Henson. It would have been admissible whether there was a conspiracy or not. Um, the defendant made the statement, that's his statement against interest that would have come in no matter what, conspiracy or not. That makes it okay. So, so am I understanding you to say it may not be independent evidence, but it comes in any way? Is that, would that be accurate? No, we're saying it's independent evidence. And I didn't understand that part. I'm glad, I'm glad the court allowed me to make myself clear. We're saying it's on anything from Dr. Henson or was a statement as, as part of the conspiracy necessarily. It was independent evidence of the conspiracy. That's what we're saying. The, uh, the other, the other independent evidence is we put on a lot of evidence that the pharmacy prescriptions increased considerably. Once Mr. Henson, once Henson began having his prescriptions filled at the pharmacy, that's, that's unequivocally independent evidence. Uh, the three to one sign. Was there any, the, uh, the, the, what I understood from the defendant is that, that he alleged this was, uh, legitimate because he, he believed Mr. Henson or Dr. Henson's, um, what he told him, which was he, he'd just taken on another, another doc's clients or, and so he'd had an influx of patients and therefore, was there any truth to that? Well, you know, here's where we get into the clear air standard of review. There may be another permissible view of the evidence. The court may have, may have just articulated another permissible view of the evidence, which the defendant shares, but the district court's view of the evidence was, was permissible. We don't think it was equally permissible. We think it was the better view of the evidence. Um, but that's where we get into clear air based on the evidence that the court received that finding was not clearly erroneous because it was permissible. It was plausible. The court looked at, we put on evidence about the dosages, the pill quantities and the dangerous combinations. And, and from that evidence, the court concluded that a conspiracy existed. The court looked at the evidence of the pharmacy's prescriptions increased as, as evidence of the conspiracy. Could it, could the court have taken a different view? Yes. Was the district court's view permissible and plausible? Yes. Was there no, it seems that you relied primarily on the independent evidence. So on the three to one policy and could you address, I'm sorry, could you address Mr. Kimmerer's statement that, that this policy was, there was evidence that this policy was in effect long before. Yes. In his reply brief, the defendant says as evidence that the policy was in effect before he cites to the testimony of Mr. Atunia's employee, Ragat Sabra, who was a relief pharmacist. He cites to volume nine, page 2031 to 2032 for the proposition that Sabra testified that the sign was up by March, 2014, well before the period of the conspiracy. But if you look at page, volume nine, page 2033, I'm sorry, volume nine, page 2032, it does not say that. It does not say that. The question was, at trial, he asked her, so the sign came up sometime after March of 2014. Answer, yes. So the only thing that, that transcript, paragraph shows that the sign was put up sometime after March 15. It doesn't say by March 2014. It doesn't say before March 2014 or anything of the, anything of the kind. Now, what did the district court listen to by way of evidence that, that about the sign? We put on evidence that sign was created after the conspiracy started, that the sign was created, that the sign was created on a computer at Neighborhood on October 16, 2014, that one of Henson's clients or customers texted a copy of the sign to him on October 22, and that by October 23, this, the Henson scripts complied with the three-to-one policy, and that on October 23, the defendant called Henson and left the voicemail saying, we need you to put more non-controlled substance prescriptions. So the evidence that we presented supports the plausible view or non-clearly erroneous view that the three-to-one sign is evidence of the conspiracy. And, and, and in regards to this idea of independent evidence, we don't think Bajorle really stands for the proposition that you need independent evidence. I don't think Bajorle even really reached that question. They left it lurking in the opinion. This court said in Al-Qurta that, that it doesn't have to be substantial. We think, we think that we have substantial evidence, but even if it were insubstantial, we would still comply. So we think we're fine on the James hearings and the findings because they represent a permissible and plausible view of the evidence that is not clearly erroneous. And the court had enough evidence to conclude that the way it did by preponderance of the evidence, which are the only standards this court should consider. I'd like to move on to a different issue if the court would allow at this time. Okay. Issue two, I'm not going to talk about confrontation. That was not preserved. There's no point in talking about confrontation or batting down arguments the defendant hasn't even made. So I'll move to this idea of the cumulative testimony. This is sort of an interesting, this is, this, this, this contains, this contains several, we divide this argument into three portions in our brief through end use testimony, cumulative testimony, business practice testimony. The business practice testimony is waived. The cumulative testimony, which is argument three B, the defendant has not really shown any error. He relies on a statement from the court. Well, we've been going over this several times and some of this may be cumulative, but he doesn't identify in his brief, any testimony that was admitted over his objection as, and which was cumulative and, and then in another ledger or another part of the brief identified where that test, what other testimony that is cumulative to. He doesn't ever do that. He has to do that to substantiate a claim of error. He can say all he wants. Oh, it's obvious that there was cumulative testimony, but it's not apparent from his brief. He doesn't make the And then we all do also argue that any testimony, any, any, any error in admitted cumulative testimony, which defendant has not shown is harmless because any such testimony was cumulative of other properly admitted evidence. So evidence about the three to one policy or the three to one sign, even if it was cumulative evidence about the three to one sign was properly admitted in the first place. So the possibility that cumulative testimony could require reversal is extremely remote, if not non-existent. The end use testimony, which we treat as argument 3A in our brief, the court allowed that as, as res geste under rule 106, rule of completeness, res geste. We argue that that was properly admitted under those doctrines and that any error in admitting that was harmless. So that's what we have to say about that issue. So with, with those, those points being made, we really don't think there's much else to say about this case. It involved one of overwhelming evidence where it really just showed a, a, a conspiracy between the defendant and, and Dr. Henson to fill illegitimate prescriptions with the motive on both sides being money. Dr. Henson could not be in business unless somebody filled his prescriptions. And the evidence showed that, that Mr. Otonye received a huge financial windfall and benefit from filling those prescriptions, which he had every reason to know were illegitimate based on the high dosages, the dangerous combinations, and the number of, and the, and the, uh, the pill quantities that were, that were prescribed. So we think it's a case of overwhelming evidence on sufficiency and that this court should affirm the convictions. I, I'm ready to take any other questions the court may have. If the court doesn't have any questions, I'd yield the remainder of my time. Any questions? No. All right. Thank you, Mr. Brown. I think, uh, Mr. Kimmerer exhausted his allocated time. So, uh, we'll conclude this argument and, uh, consider the case submitted. Uh, counsel are excused and, uh, thank you for your arguments this morning.